**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**
**NORTHERN DIVISION**

| | |
|---|---|
| DAVID DEWAYNE SCHNEBELEN and SERENA JOYCE SCHNEBELEN, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | Case No. 1:07-CV-125 TC |
| JOSHUA PORTER et al., | District Judge Tena Campbell |
| Defendants. | |

Plaintiffs, David Dewayne Schnebelen and Serena Joyce Schnebelen, each filed separate *pro se* civil rights suits under 42 U.S.C. § 1983 while confined at the Weber County Jail. Plaintiffs were granted leave to proceed *in forma pauperis* under 28 U.S.C. § 1915(b). Plaintiffs subsequently retained counsel, who moved to consolidate the two cases. The motion to consolidate was granted and Plaintiffs' counsel filed an Amended Complaint in this consolidated case on May 23, 2008. Before the court is a motion for summary judgment filed by Defendants Porter, Peay and Lee of the Morgan County Sheriff's Office ("Morgan County Defendants"), and a separate summary judgment motion by Defendant Jones of the Utah Highway Patrol.[1]

---

[1]In addition to the moving Defendants, the Amended Complaint originally named as defendants numerous officials with the Weber/Morgan Drug Strikeforce ("Strikeforce"), but those

**ANALYSIS**

## I.   Background

Plaintiffs' Amended Complaint alleges civil rights violations under the Fourth, Fifth, Eighth and Fourteenth Amendments stemming from a traffic stop which resulted in Plaintiffs' arrest on drug charges.  Plaintiffs also assert a state law cause of action for intentional infliction of emotional distress.  Plaintiffs' Amended Complaint seeks general, punitive and special damages, attorney fees, court costs and "such other and further relief as the Court deems just and proper."

Morgan County Defendants have submitted a motion to dismiss, or, alternatively, motion for summary judgment, asserting that Plaintiffs' evidence is not sufficient to show any constitutional violation.  Because Defendants' motion and Plaintiffs' response are supported by materials outside the pleadings, including sworn affidavits and answers to interrogatories, the court treats the Morgan County Defendants' motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d).  Defendant Jones also moves for summary judgment with supporting affidavits and exhibits.  All defendants have asserted the defense of qualified immunity.

individuals have already been dismissed based on a stipulation of the parties.

## II.  Facts

The undisputed facts presented here are drawn primarily from
the dashboard camera ("dashcam") video recordings taken from
Deputy Porter and Trooper Jones' patrol cars, (Exs. 3 and 7 to
Mem. Supp. Mot Dismiss (Dkt. no. 73)), and the sworn declarations
of Defendants (Mem. Supp. Mot. Dismiss. (Dkt. no. 71), Exs. 1-2,
8-9, 11-12).  The court construes the facts in the light most
favorable to Plaintiffs, the non-moving parties.  *Lopez v.
LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

On May 3, 2007, at 10:48 p.m., Deputies Porter and Peay of
the Morgan County Sheriff's Department pulled over a dark, two-
door Honda Civic with Arkansas plates traveling on I-84.  The
deputies stopped the Honda based on observed equipment
violations, including flashing blue lights under the car and a
loud, defective exhaust system.  Deputy Porter approached the
driver, David Schnebelen ("David"), explained the reason for the
stop, and requested his driver's license and car registration.
David said that he had no driver's license or other
identification, that he had no car registration because the car
belonged to a friend, and that his name was Garland Richard
Diemer.  Simultaneously, Deputy Peay spoke to the female
passenger, Serena Schnebelen ("Serena"), who falsely identified
herself as Amanda Daniels.  Serena stated that she had a driver's

license but it was not with her.  The officers entered the given names and birth dates into their computer system but found no records for them.

Based on Plaintiffs' failure to provide identification or documentation confirming their ownership of the car, the deputies determined that Plaintiffs' car would have to be impounded.  The officers removed Plaintiffs from the car and called a state trooper for assistance.  Because the officers were impounding the car, they began to "inventory" the car.  They quickly discovered two glass pipes in the ash tray containing white residue which appeared to be methamphetamine.  The officers then put handcuffs on the Plaintiffs, searched them, and secured them in the deputies' patrol car before continuing their search of the Honda. Upon being placed in the car, Plaintiffs complained about being cold and a deputy adjusted the heat.

About ten minutes later Deputy Porter returned to the patrol car and told Plaintiffs they were under arrest for possession of drug paraphernalia and methamphetamine.  Porter told Plaintiffs to sit patiently and he would get back to them.  When Porter returned a few minutes later Plaintiffs again complained about being cold, but Porter, stating that it was "sweating hot" in the car, refused to turn up the heat.  After the deputies discovered additional contraband in Plaintiffs' car, they read Plaintiffs

*Miranda* warnings before asking them questions.  When the deputies confirmed that some of the Honda's contents were associated with methamphetamine production they discontinued their search and called for the Weber/Morgan Narcotics Strikeforce to respond. Approximately thirty to forty minutes later, Strikeforce Agents Beck and Haney arrived.  Later, the rest of the Strikeforce arrived.[2]

Shortly after midnight, Trooper Jones of the Utah Highway Patrol arrived and took charge of the scene.  After confirming that Plaintiffs had been read their *Miranda* rights, Jones removed each of them from the deputies' patrol car, searched them, and transferred them to his patrol car.  While being moved to Jones' patrol car David complained that his handcuffs were too tight and that he was experiencing pain in his injured shoulder from being cuffed behind his back.  Jones examined the cuffs and found that they were adjusted correctly.  Jones also noted that David was secured with two pairs of handcuffs linked together—a technique called "double-cuffing"—in order to reduced the strain on his shoulders.  While searching David, Jones questioned him about his identity and David admitted to giving a false name.

---

[2]Detective Jason Lee of the Morgan County Sheriff's Office also responded and helped with inventory of the Plaintiffs' Honda; however, Lee never had any personal contact with Plaintiffs.

After Serena was placed in Jones' patrol car, she told Jones that she had a "weak bladder" and asked Jones to loosen her seatbelt, which he did.  Jones then cautioned Serena not to urinate in the car and explained that if she needed to urinate urgently she would have to do so in front of the car.  When Jones asked Serena if she needed to urinate she replied, "I'll be okay."  Jones then left Plaintiffs in the car and went to speak with the other officers.

At 12:50 a.m., Jones returned to the car and asked David about the contents of a glass jar found in Plaintiffs' car.  David explained that it probably contained water and ephedrine and volunteered to help the officers process the car.  When Jones declined David's offer, citing safety and legal concerns, David repeatedly stated "I'll even sign a waiver, ain't nobody suing you."  After further discussion David asked Jones for a cigarette and a blanket.  Jones refused but did turn up the heat.  Plaintiffs then fell asleep for about thirty-five minutes in the patrol car.

At 1:46 a.m., Agent Haney woke up the Plaintiffs and, after confirming that they had been read their *Miranda* rights, asked David more questions about the items found in the car.  David answered the questions voluntarily.  After a brief conversation, Haney closed the car door and left.

At 1:58 a.m., Plaintiffs started yelling and banging on the window to get an officer's attention, screaming that David was in pain. Within seconds an officer checked on them and said he would tell Jones about the problem. At 2:02 a.m., Jones removed David from the car and changed the double cuffs behind his back to a front belly chain. David then went with the officers to answer more questions while Serena slept.

At 2:41 a.m., the officers returned David to Jones' patrol car. David told Serena that officers were going to question her next and he instructed her what to say. Serena then began crying and screaming. At one point she stated that there was something hot on the floor and she was "pouring sweat." David got an officer's attention and explained that "the heat [has] been on too long, her wrists are swollen." Jones then took Serena out of the patrol car and changed her restraints to a belly chain. When Jones asked David what was wrong with Serena he explained that her seatbelt had become too tight and that she probably needed to use the restroom urgently. Concerned that Serena might be experiencing withdrawal symptoms, Jones called for an ambulance to come examine her. When questioned further about Serena's condition, David denied that he or Serena were experiencing any form of drug withdrawals. Soon after, Serena was taken to the car where she sat speaking to David and crying until the

ambulance arrived.

At 3:07 a.m., Morgan Emergency Medical Technicians (EMT) Dee Glauser and Cindy Gray arrived. After removing Serena from the car and allowing her to relieve herself, the EMTs examined her and found her vital signs to be normal. A short time later an unidentified officer opened the car door and, apparently referring to the methamphetamine, brusquely asked, "What do you use to gas this shit with?" David responded, "sulphuric acid and salt." Agent Beck then told Jones that Plaintiffs needed to be decontaminated before they could be taken to the Weber County Jail. EMTs Glauser and Gray were told to return to Morgan City and prepare the fire station for the decontamination. At 3:47 a.m., Trooper Jones and Deputy Porter took Plaintiffs to the Morgan City Fire Station in Jones' patrol car, arriving at approximately 3:54 a.m.

In anticipation of the decontamination, Fire Chief Rich prepared the fire station by increasing the heat in the bay area. EMT Cindy Gray conducted the decontamination of Serena with Trooper Jones and Deputy Porter present for security. Serena was required to disrobe in the fire bay and EMT Gray then washed her down with warm, soapy water and a soft brush starting from her head and working down. Serena was then rinsed with cold water and given a towel to dry herself and a hazmat suit and booties to

wear.  David was also put through the same decontamination process by male EMT Dee Glauser.  Once the EMTs completed the decontamination, Plaintiffs were secured in Jones' patrol car at 4:30 a.m.  As he was securing them in the car, Jones asked Plaintiffs whether they were "comfy" and both laughed and joked with the officers.  Deputies Jones and Porter took the Plaintiffs back to the scene of the traffic stop.  When they arrived at 4:37 a.m., David asked the officers if they could "turn up the heat a notch" but got no response.  A few minutes later, Plaintiffs fell asleep in the car.  At 5:57 a.m., Jones returned to the patrol car and drove directly to the Morgan County Jail as the Plaintiffs slept, arriving at 6:30 a.m.

### III. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."  *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986).  Thus, Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move "with or without

supporting affidavits for a summary judgment in the party's favor upon all or any part of [a claim]."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case."  *Celotex*, 477 U.S. at 325. This burden may be met by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case.  *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden, "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element."  *Id.* Federal Rule of Civil Procedure 56(e) requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant."  *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998).  The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."  *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992).  Mere allegations and

references to the pleadings will not suffice.  However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### IV. Summary Judgment Analysis

Plaintiffs' Amended Complaint does not clearly state the legal and factual basis for each of Plaintiffs' claims.[3]  After thoroughly reviewing the Amended Complaint and Plaintiffs' summary judgment materials, however, the court has identified the following claims: (1) unreasonable use of handcuffs and other restraints; (2) unreasonable use of force and denial of privacy during decontamination; (3) extended detention in police patrol car; and (4) unconstitutional conditions of detention, including exposure to heat and cold, denial of drinking water, and denial of restroom access.  The first three grounds are analyzed under the Fourth Amendment's prohibition against unreasonable searches and seizures, while the last invokes the due process protections

_____

[3]  Under the heading "First Cause of Action," the Amended Complaint simply "adopt[s] by reference" the entirety of Plaintiffs' factual allegations and then presents a list of constitutional provisions which were purportedly violated by Defendants.  This approach does not comport with the general rules of pleading under Rule 8, *see* Fed. R. Civ. P. 8, which are intended to ensure "that defendants enjoy fair notice of what the claims against them are and the grounds upon which they rest." *TV Commc'ns Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1062, 1069 (D. Colo. 1991), *aff'd*, 964 F.2d 1022 (10th Cir. 1992).

of the Fourteenth Amendment.  The court will address each of
these claims in turn.

## A. Fourth Amendment Claims

### 1. Legal Standard

The Tenth Circuit has held that all claims of excessive
force before a defendant is formally charged or brought before a
judicial officer are governed by the objective reasonableness
standard of the Fourth Amendment.  *Austin v. Hamilton*, 945 F.2d
1155, 1159-62 (10th Cir. 1991) (abrogated on unrelated grounds).
Moreover, it is well established that where a particular
Constitutional Amendment "provides an explicit textual source of
constitutional protection" against a particular sort of
government behavior, "that Amendment, not the more generalized
notion of 'substantive due process,' must be the guide for
analyzing [such] claims." *Graham v. Connor*, 490 U.S. 386, 395
(1989).  Thus, Plaintiffs' claims regarding the various uses of
force during their detention are analyzed under the Fourth
Amendment, not the Due Process Clause.

The Supreme Court has explained that the touchstone of the
Fourth Amendment reasonableness inquiry is whether the officers'
actions are "objectively reasonable." *Id*.  The reasonableness of
a seizure depends not just on why or when it is made, but also on
how it is accomplished. *Id*.  Thus, the inquiry focuses not on

the officers' particular motivations, nor on the arrestee's subjective perception of the intrusion, but on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id*. at 397. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. Moreover, the Fourth Amendment "does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005) (citation omitted).

While the Fourth Amendment reasonableness inquiry cannot be reduced to a simple formula or bright line test, the Supreme Court has delineated three, non-exclusive factors relevant to analyzing the reasonableness of force used during arrest: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Although these factors focus primarily on the circumstances confronting an officer before and during an arrest, they are no less relevant after a suspect has been arrested but remains in the custody of the arresting officer. *Austin v. Hamilton*, 945 F.2d 1155, 1160

n.3 (10th Cir. 1991).

Finally, it is well recognized that "[n]ot every push or
shove, even if it may later seem unnecessary in the peace of a
judge's chambers, violates the Fourth Amendment." *Graham*, 490
U.S. at 396 (citation and quotation marks omitted).  Instead, to
make out a claim of excessive force, a plaintiff must show "some
actual injury that is not *de minimis*, be it physical or
emotional." *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir.
2007).  Although proof of physical injury, such as visible cuts,
bruises, etc., is not an essential element of an excessive force
claim, "the absence of injury in the context of the totality of
the circumstances may suggest the absence of excessive force."
*Id*. at 1129 n.24.

## 2. Evidentiary Sufficiency

### i.  Handcuffing

Plaintiffs assert that the manner and duration of their
handcuffing was unreasonable under the circumstances presented
here.  Specifically, Plaintiffs contend that their being
handcuffed behind the back while detained in Jones' patrol car
for several hours amounted to excessive force.  Plaintiffs have
not presented any evidence of physical injury related to their
handcuffing, but the record does show that Plaintiffs experienced
significant discomfort after prolonged handcuffing and so the

14

officers changed the restraints from the back to the front.

The Supreme Court has recognized handcuffing as an appropriate response to officer-safety concerns even during investigative detentions. *Muehler v. Mena*, 544 U.S. 93 (2005). However, the justifiable initial use of handcuffs can become unreasonable if other factors, such as prolonged duration, "affect the balance of interests under *Graham*." *Id*. at 100. The Tenth Circuit has recognized that the safety concerns justifying handcuffing are not dispelled once a seizure or arrest has occurred because, even while in custody, "an arrestee remains a risk to officers, nearby persons or property and, as an escape threat, the community at large." *Austin*, 945 F.2d at 1160 n.3.

The evidence here does not support the Plaintiffs' contention that the handcuffing was objectively unreasonable under the *Graham* factors. First, the crime for which Plaintiffs were initially seized and arrested (i.e., possession of methamphetamine and drug paraphernalia) gave officers good reason to suspect that Plaintiffs might be under the influence of drugs and prone to act erratically or aggressively. Moreover, the subsequent discovery of a mobile methamphetamine lab in Plaintiffs' car necessarily heightened Defendants' concerns regarding the seriousness of the charges under investigation and the risk that Plaintiffs might try to escape. Second, the

circumstances of the arrest and detention presented substantial risk of harm to the officers and others. Not only did the arrest occur in the middle of the night on the side of a busy interstate highway, but officers soon learned they were dealing with a host of unidentified and potentially dangerous chemicals. Finally, although there is no evidence that Plaintiffs resisted arrest, they were driving an out-of-state car which did not belong to them and they initially gave officers false information about their identities. These factors would lead a reasonable officer to believe Plaintiffs presented a heightened risk of escape.

Viewing the totality of the circumstances, the court concludes that the restraints used here were not in any way unreasonable. Despite the obvious risks to Deputies Peay and Porter during the initial investigation, they did not physically restrain Plaintiffs until after they found meth pipes in Plaintiffs' car, which gave them probable cause for an arrest. The deputies also accommodated David's alleged shoulder injury by double-cuffing him to reduce the strain on his shoulders. When Trooper Jones took custody of Plaintiffs and transferred them to his car he examined David's cuffs to make sure they were adjusted correctly and he allowed David to remain double-cuffed. When Serena complained that her seatbelt was too tight, Jones adjusted it to reduce the pressure on her bladder. And, immediately upon

learning that Plaintiffs were experiencing discomfort from prolonged handcuffing behind the back, Jones changed their restraints to a belly chain with cuffs in front.

In sum, Defendants not only had ample justification for restraining Plaintiffs, they also showed moderation regarding the type of restraints and the manner in which they were used. Moreover, Plaintiffs have not shown that they suffered any significant injury from their restraints. Accordingly, the court concludes that the evidence here does not support a Fourth Amendment claim based on use of physical restraints.

### ii. Decontamination

Plaintiffs challenge the reasonableness of the decision to decontaminate them, as well as the manner in which the decontamination was carried out. Plaintiffs assert that there was no need to decontaminate them because Defendants had no reason to believe Plaintiffs were actually contaminated by any dangerous chemicals. Plaintiffs further contend that the decontamination was merely a pretext to abuse and humiliate them, as shown by the failure to decontaminate any of the officers involved, and by Defendants' decision to return Plaintiffs after decontamination to the very same patrol car where they were previously held for hours. Finally, Plaintiffs assert that during the procedure they were unreasonably denied privacy and

subjected to excessive force.

The Tenth Circuit applies a two-part test to determine whether a risk of personal danger is sufficient to create exigent circumstances justifying a warrantless search: 1) whether officers had an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others; and, 2) whether the manner and scope of the search was reasonable. *U.S. v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

Turning first to the justification for the decontamination, the court finds sufficient evidence to support Defendants' decision that decontamination was necessary to protect the safety of themselves and others. Both the photographs taken at the scene and the sworn statements of Agents Beck and Johnson confirm the extent of toxic chemicals present in Plaintiffs' car, including powdered ephedrine, red phosphorus, crystal drain opener containing caustic soda and sodium hydroxide, iodine, sulfuric acid, butane, gasoline additives, bleach, hydrogen peroxide, camping fuel, and other toxic and combustible items. (Mem. Supp. Mot. Dismiss Exs. 4-5.) Plaintiffs do not deny having these items with them in their car, nor do they dispute that standard protocol required that persons exposed to such chemicals be decontaminated before being booked into the jail.

Plaintiffs' argument that decontamination was unnecessary

because they had not manufactured methamphetamine for quite some time before their arrest is unavailing.  Given the presence of substantial quantities of toxic chemicals in Plaintiffs' car, and Plaintiffs' admission that they had traveled many hours with the chemicals in their car before the stop, Defendants justifiably concluded that Plaintiffs were contaminated.  Plaintiffs have not shown that Defendants had a convenient method for testing Plaintiffs for contaminants, or that Defendants had any reason to believe the Plaintiffs were clean.  In fact, given Plaintiffs' earlier dishonesty, it was reasonable for officers to suspect the veracity of Plaintiffs' claims.  Plaintiffs have not offered any evidence to contradict evidence that decontamination is routinely performed under similar circumstances.  The officers' decision to decontaminate Plaintiffs was reasonable under the circumstances here.

There is also no evidence in the record to support Plaintiffs' contention that the method or scope of the decontamination was unreasonable.  The decontamination procedure consisted of washing Plaintiffs' bodies with warm, soapy water and rinsing them with cold water.  There is no evidence that harsh abrasives, excessive water pressure, or extremely hot or cold water was used.  Moreover, the record shows that considerable measures were taken to reduce Plaintiffs'

discomfort, including performing the procedure indoors and increasing the heat in the decontamination area. Plaintiffs' contention that the decontamination was ineffective or pretextual because they were placed back in the same patrol car is also unpersuasive. Not only were Plaintiffs given clean hazmat suits to wear before being placed back in the patrol car, there is no evidence that significant contamination can result from such short term placement in an otherwise clean car.

Plaintiffs' primary complaint about the decontamination seems to be that they were forced to stand naked in front of members of the opposite sex. The record on this point, however, shows that each Plaintiff was decontaminated by a qualified person of the same sex and that others were present only as necessary for logistical or security reasons. There is no evidence that Plaintiffs were exposed to large numbers of people or that they were subjected to harassment, ridicule or undue humiliation. Instead, the record shows that the ordeal was very brief (the total time at the fire station was approximately thirty minutes) and the procedure was performed in a businesslike and professional manner by trained professionals. Moreover, Plaintiffs' demeanor following the procedure was not consistent with having been thoroughly humiliated or mistreated.

Thus, the court concludes that Defendants had ample

justification to decontaminate Plaintiffs and that both the
nature and scope of the intrusion were reasonable under the
circumstances.

### iii. Extended Detention

Plaintiffs also contend that the duration of their detention
in the custody of arresting officers, before being booked into
the jail, was unreasonable.  In total, Plaintiffs spent
approximately seven hours in custody before arriving at the jail.
During most of this time Plaintiffs were secured in the back of
Trooper Jones' patrol car at the scene of the traffic stop.
Plaintiffs assert that this prolonged detention in the patrol car
was unreasonable because the officers had no compelling reason to
keep them at the scene.[4]

While an excessive length of detention may be sufficient to
violate the reasonableness requirement of the Fourth Amendment,
the Supreme Court held in *Gerstein v. Pugh*, 420 U.S. 103 (1975),
that an officer's "on-the-scene assessment of probable cause"

---

[4] The court notes that Plaintiffs have no basis for
challenging the duration of the initial investigatory detention.
According to the dashcam video, only forty minutes elapsed
between Plaintiffs' initial stop and their arrest.  This was
clearly reasonable based on the false information provided by
Plaintiffs, their lack of identification, and the fact that the
out-of-state car they were driving did not belong to them.  *See
U.S. v. Villa-Chaparro*, 115 F.3d 797, 801-02 (10th Cir. 1997)
(forty-five minutes to investigate vehicle stopped for traffic
violation was justified).

justifies an arrest and "a brief period of detention to take the administrative steps incident to arrest." *Id*. at 113-14. The Court also held that individuals arrested without a warrant are entitled to a timely judicial determination of probable cause before "extended restraint of liberty following arrest." *Id*. at 114. Although the United States Supreme Court did not specify in *Gerstein* just how "promptly" a probable cause determination must be made, *see id.* at 125, in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Supreme Court clarified that a determination of probable cause within forty-eight hours is presumptively reasonable. *See id.* at 56. In the case of detentions lasting more than forty-eight hours, the government bears the burden of proving an emergency or other extraordinary circumstance justifying the delay. *Id*. at 57.

Plaintiffs have not presented any legal support for their contention that a seven-hour detention in a patrol car following a valid warrantless arrest is *per se* unreasonable under the Fourth Amendment. Nor is the court aware of any support for such a contention. Instead, under well established Supreme Court precedent, Plaintiffs were only entitled to appear before a judicial officer for a probable cause determination within a reasonable time after their arrest (which the Supreme Court has held may exceed forty-eight hours) *Id.* Regardless of any delay

in transporting Plaintiffs to the jail, Plaintiffs do not deny that their initial court appearance occurred within forty-eight hours after their arrest.

The record also shows that the delay in transporting Plaintiffs to the jail was reasonable under the circumstances. It is undisputed that during the entire time Plaintiffs remained in Jones' patrol car at the scene of their arrest, Jones was actively assisting officers in processing Plaintiffs' car. There is no evidence that Jones attended to unrelated business or made any unnecessary side-trips with Plaintiffs in the car. Numerous factors also contributed to the delay in transporting Plaintiffs to the jail, including the difficulty identifying Plaintiffs due to their lack of cooperation, the late hour of the arrest when fewer officers were on duty, the need to call for the Strikeforce to safely process Plaintiffs' car, the unknown nature of the chemicals in the car, the need for Plaintiffs' assistance in identifying the chemicals, and the need to decontaminate Plaintiffs before taking them to the jail. Considering these factors, the court finds that Defendants were not dilatory in transporting Plaintiffs to jail but were merely taking necessary steps incident to Plaintiffs' arrest.

The evidence here does not support a claim of unreasonable seizure under the Fourth Amendment based on Plaintiffs' extended

detention at the scene of their arrest.

## B. Due Process Claim

Plaintiffs assert that Defendants unreasonably ignored their repeated complaints about the temperature in the car and denied their requests for drinking water and restroom access. Plaintiffs assert that the temperature in the car was sometimes too hot and sometimes too cold. Serena alleges that due to excessive heat and the lack of drinking water she became dehydrated and her wrists swelled up, making her restraints more uncomfortable. Plaintiffs also assert that they repeatedly asked for water but their requests were either denied or ignored. Finally, Serena contends that she was repeatedly denied restroom access and was forced to urinate on the side of the road in the presence of others.

### 1. Legal Standard

Although pretrial detainees are protected under the Fourteenth Amendment's due process clause rather than the Eighth Amendment, *see Lopez v. LeMaster,* 172 F.3d 756, 759 n.2 (10th Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)), the Tenth Circuit has held that the Eight Amendment deliberate indifference standard provides the benchmark for all conditions of confinement claims, regardless of whether the plaintiff is a prisoner or a pretrial detainee. *See Olsen v.*

24

*Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

To establish deliberate indifference based on inhumane conditions of confinement, a plaintiff must satisfy both an objective and a subjective component. Under the objective component, the deprivation alleged must be sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the subjective component, the official must have acted with a sufficiently culpable state of mind, namely "deliberate indifference to inmate health or safety." *Id*. The Supreme Court has explained that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Id*. at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." *Id*. at 836-37.

## 2. Evidentiary Sufficiency

Plaintiffs have not presented evidence sufficient to satisfy either the objective or subjective component of the deliberate indifference standard set out in *Farmer*. Regarding the temperature in the patrol car, Plaintiffs have not presented any

25

objective evidence showing that they were exposed to extreme heat or cold, nor have they shown any injury or significant suffering due to exposure.  The fact that Plaintiffs complained that the car was sometimes too hot and at other times too cold shows the subjective nature of their claims.  Moreover, the dashcam video shows that although officers may have realized Plaintiffs' dissatisfaction with the temperature in the patrol car they never subjectively perceived any substantial risk to Plaintiffs' health or safety.  On the contrary, despite the fact that Plaintiffs were never in any substantial danger from exposure, officers repeatedly tried to ensure Plaintiffs' comfort by monitoring and adjusting the temperature in the car.

Similarly, there is no support for Plaintiffs' claim that their safety was jeopardized by being denied drinking water. Despite their assertions that they repeatedly asked for water, Plaintiffs have not pointed to a single specific instance on the video recording where they made such a request, nor was the court able to find one.  This failure is even more persuasive given Plaintiffs' repeated requests for everything from cigarettes to help purchasing bus tickets; if Plaintiffs were truly in desperate need of water they likely would have asked for it on record.  In fact, even when Serena became agitated and complained of "pouring sweat," she did not specifically request water.

Moreover, Serena was examined by EMTs shortly after this episode and was not found to be dehydrated.

Finally, there is no evidence that Plaintiffs suffered extreme discomfort or injury from being denied restroom access, much less that Defendants were indifferent to such needs. Although Serena did complain of a "weak bladder" when she was initially arrested, at no point on the video is she heard saying that she urgently needed to use the restroom. Instead, when asked whether she needed to urinate she repeatedly stated that she was okay. The record also shows that Defendants accommodated Serena by allowing the EMTs to accompany her to relieve herself at the scene. While the conditions under which she relieved herself were certainly less than desirable, there is no evidence that a safe alternative was readily available. Nor does the fact that she may have been exposed to the officers or others, by itself, show a constitutional violation.

Thus, based on the record before it, the court finds no evidence to support Plaintiffs' claims that they were subjected to unconstitutional conditions of confinement or that Defendants were deliberately indifferent to their basic needs.

### V. Qualified Immunity

Because Plaintiffs have not shown that Defendants' actions violated any constitutional right, the court need not decide

whether Defendants are entitled to qualified immunity.

## VI.  Supplemental State Law Claims

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims if the court has dismissed all claims over which it has original jurisdiction.  *See* 29 U.S.C.A. § 1937(c)(3) (West 2010).  Having concluded that Defendants are entitled to summary judgment on Plaintiffs' constitutional claims, the court declines to exercise supplemental jurisdiction over Plaintiffs' state law claim of intentional infliction of emotional distress.

### ORDER

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that:

(1) Defendants Porter, Peay and Lee's Motion to Dismiss or for Summary Judgment (Dkt. no. 72) is **GRANTED**;

(2) Defendant Jones' Motion for Summary Judgment (Dkt. no. 80) is **GRANTED**; and,

(3) this case is **CLOSED**.

   **DATED** this 20th day of September, 2010.

      BY THE COURT:

      _____
      TENA CAMPBELL, Chief Judge
      United States District Court